# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

        **Plaintiff,**

**v.**                                    **Case No. 11-C-770**

**AURORA HEALTH CARE INC.,**

        **Defendant.**

---

## DECISION AND ORDER

---

        This Decision and Order addresses Defendant Aurora Health Care Inc.'s ("Aurora"), summary judgment motion, brought pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rule 56.1, for dismissal of the race discrimination and retaliation claims and this entire action, and award of costs. (ECF No. 17.) The Equal Employment Opportunity Commission (the "EEOC") filed this action on behalf of LaRhonda Tatum ("Tatum"), who was employed as an administrative assistant by Aurora from May 7, 2007, through October 2, 2009. The EEOC alleges that from at least April 2009, through October 7, 2009, Aurora discriminated against Tatum on the basis of her race (black), in violation of the Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., by subjecting Tatum to different terms and conditions of employment, terminating her employment, and retaliating against her for filing internal complaints and complaints with the EEOC. (ECF No. 1.)

## MOTION FOR SUMMARY JUDGMENT

Some preliminary issues regarding the parties' summary judgment filings require discussion. In Aurora's reply to the EEOC's responses to its proposed findings of fact ("PFOF"), Aurora objects to those responses as exceeding the 100 additional proposed findings of fact allotted to the EEOC and requests that they be stricken. (*See* ECF No. 42.) Examples of the objections are found in paragraphs 4, 9, and 14 of Aurora's reply.

Civil Local Rules 56(b)(2)(B)(i) and (ii) (E.D. Wis.) provide in relevant part:

Each party opposing a motion for summary judgment must file . . .

a concise response to the moving party's statement of facts that must contain:

(i) a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon, and

(ii) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, declarations, parts of the record, and other supporting materials relied upon to support the facts described in that paragraph. A non-moving party may not file more than 100 separately-numbered statements of additional facts; . . .

Aurora is melding the two subsections of Civil Local Rule 56(b)(2)(B) together. However, Civil Local Rule 56(b)(2)(B)(i) does not contain a numeric limit for an opposing party's response to a proposed finding of fact. Rather, it requires a reproduction of each numbered

2

paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, "specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon." *Id.* The EEOC's response to Aurora's proposed findings of fact does not violate Civil Local Rule 56(b)(2)(B)(i). Aurora's objection does not provide a basis for striking the EEOC's response to its proposed findings of fact.

Aurora has also objected to some of the EEOC's supplemental findings of material fact ("SMF") as compound, stating that a proposed material finding of fact has two separate findings of fact. (*See* Def.'s Reply to Pl.'s SMF ¶¶ 23, 28, 31, 33, 34.) (ECF No. 41.) Aurora's objections are correct and noted.

### Summary Judgment Standards

An initial question is whether there is a genuine dispute of material fact precluding resolution of this action upon summary judgment. In making that determination, the Court applies the following criteria to Aurora's PFOF and supplemental proposed findings of fact ("SPFOF"), and the EEOC's SMF.

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "a party may move for summary judgment, identifying each claim . . . on which summary judgment is sought." This Court must view the facts in the light most favorable to the non-movant, resolving all evidentiary conflicts in her favor and according her the benefit of all reasonable

3

inferences that may be drawn from the record. *See O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Put another way, summary judgment is appropriate when there are no genuine factual issues that could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Although the moving party bears the initial burden of informing the Court of the basis for its motion, it may satisfy its burden by simply showing or pointing out to the Court that there is an absence of evidence supporting the non-moving party's case. *Celotex,* 477 U.S. at 325. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to withstand summary judgment. *See Anderson*, 477 U.S. at 252.

Summary judgment is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). But if it is clear that the non-movant will be unable to establish an essential element of his claim, summary judgment is not only appropriate, but mandated. *Massey v. Johnson,* 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex,* 477 U.S. at 322-23).

4

**Relevant Facts[1]**

Aurora is a health care provider, doing business in the State of Wisconsin, and has continuously had at least 15 employees. The metropolitan Milwaukee area of Aurora's Hospital System includes the following hospitals: Aurora St. Luke's Medical Center ("Aurora St. Luke's"), Aurora Sinai Medical Center ("Aurora Sinai"), Aurora St. Luke's South Shore and Aurora West Allis Medical Center.

Aurora has an Administrative Manual that addresses employee conduct and discipline. It states in pertinent part:

> An employee who engages in conduct that is contrary to the rules of common sense or decency, or an act which violates Aurora Health Care policies or procedures, should expect to be disciplined. *The nature of the discipline will depend on the nature of the violation and the surrounding circumstances.*
>
> * * * *
>
> The purpose of the discipline procedure is to encourage employees to take corrective action and to make improvement in their work performance or work habits. Ordinarily, discussion with an employee, to point out what is expected or to tell the employee how he or she is doing, should be enough. There are times, however, when these corrective actions are not enough and more severe discipline is required. Such discipline may include verbal counseling, written warnings, suspensions without pay (subject to applicable limitations for exempt employees) or

---

[1] The relevant facts are based on the stipulated facts (ECF No. 18), Aurora's PFOF and SPFOF (ECF Nos. 19 & 40) as, the EEOC's supplemental findings of material fact (ECF No. 28), to the extent that they are undisputed. Citations to all quoted excerpts, including undisputed facts, are provided. The word "dispute" followed by a party's citation to its own proposed finding of fact does not comply with Civil Local Rule 56(2)(B)(i), and does not raise a factual dispute.

The Court will address the parties' evidentiary objections in the context of the statement to which the objection was raised. Any objection not specifically addressed has been considered.

5

discharge. *It should be emphasized that the employee's discipline need not go through each of the steps involved in, the disciplinary procedure. Discipline may begin at any step in the procedure, including discharge, and steps in the procedure may be skipped, depending upon the seriousness of the matter or the offense committed and the surrounding circumstances.*

(Ex. 35, EEOC000056.) (Emphasis added). (ECF No. 33-5).

The Manual also states:

[s]ome work performance or conduct issues are better addressed through a developmental plan rather than through the disciplinary process. In such instances, your supervisor may establish a developmental plan for you, which may involve your input. The developmental plan will state your supervisor's legitimate expectations of you, with deadlines for achieving the stated expectations. Failure to meet the terms of the developmental plan will result in the consequences stated in the plan.

(*Id.* at EEOC000058.)

In 2007 to 2009, Aurora's discipline policy and Aurora's Service Standards and Values of accountability, teamwork, and respect applied to all employees regardless of job title or work location and applied equally to chaplain residents (sometimes referred to as resident chaplains). In 2009, Aurora had a disciplinary policy, which applied principles of fairness and justness to ensure that the correct level of discipline was given.

Iris Lowery ("Lowery"), a Human Resources Director at Aurora Sinai, has expertise in human resources and has trained others in the investigation of discrimination complaints. According to Lowery, fairness and justness meant that Aurora would look at the individual's situation and the surrounding circumstances and determine, based on the

6

information and the options available as an organization, what was appropriate and what was fair and just. Aurora wanted to ensure that discipline was given in a consistent manner in similar situations. "There was an assumption that there was — [Aurora] had a progressive [discipline system], but we did not." (App. EEOC, Ex. 5 (Apr. 20, 2012, Lowery Dep.) 26:22-24.) (ECF No. 29-5.)

Aurora has a Spiritual Care Department (the "Department"), which as reflected by its name, provides spiritual guidance for patients and families. The Department is headed by a director. For both Aurora St. Luke's and Aurora Sinai, the Department also includes a pastoral care educator (sometimes referred to as the Clinical Pastoral Education ("CPE") supervisor or "chaplain educator"); chaplains; chaplain residents; and administrative assistants. The chaplain residents, who pay tuition, and the interns are students who receive hands-on training and are supervised by the CPE Supervisor, of the hospital to which they are assigned. In 2009, Aurora considered the chaplain residents employees.

In early 2007, Edwin Foster ("Foster"), a Caucasian, was the CPE Supervisor for Aurora Sinai. During the spring of 2007, Foster interviewed Tatum for an administrative assistant position in the Department at Aurora Sinai. Foster, along with Marcia Marino, the Department director at that time, decided to hire Tatum.

Tatum's job included relieving department leadership and other staff of administrative details and using judgment and discretion to solve office problems. The required know-how for this position specified a demonstrated ability to tactfully and

7

effectively communicate, in writing and verbally, with a variety of individuals.[2]    Part of Tatum's responsibilities included assisting Foster in the performance of his duties.

In August 2007, Foster became the director of the Metro Area Spiritual Care Department.  Shortly thereafter, Janice McCabe ("McCabe") became the CPE supervisor for Aurora Sinai.  After Foster became the director, Tatum provided administrative support to Foster when he was at Aurora Sinai, and to McCabe and other staff in the Aurora Sinai Department.

On August 31, 2007, Tatum sent an email to Foster stating, "There have been some concerns for me regarding the new transitions with the Sinai Pastoral Care Office." (Ex. D-1 (Tatum Dep. Ex. 14).) (ECF No. 24-4.)  Foster responded to the email, without having spoken to Tatum, stating "If there are things that I have done or said that you have concern about, I would like to hear them and understand what I have done that may have hurt or offended you, and then do what I can to correct that.  If there are concerns about the re-organization and the incoming group of students, I would want to hear that also."  (*Id*. (Tatum Dep. Ex. 16).)  He also expressed concern that Tatum might quit.  Foster also supported Tatum in other ways, including making sure her name appeared correctly in her email, accommodating schedule changes so Tatum could work another job, and giving her commendations.

---

[2]The written job description for the administrative assistant position that Aurora provided to Tatum is EEOC000325-000326, exhibit 6 to the Tatum deposition.

Foster liked Tatum, and found that she "generally was a pleasant person" and "seemed at times to have a really good sense of humor." (App. EEOC, Ex. 4 (Sept. 7, 2012, Foster Dep.) 82: 9-12.) (ECF No. 29-4.) Foster indicated "Tatum's performance was good as she began and deteriorated significantly over time." (*Id.*)

On November 19, 2007, Foster gave Tatum a positive 90-day Performance Evaluation, which noted that:

> [Tatum] has stepped into a challenging position in the department. The position has many persons who make demands upon her skills and time. She has done very well in getting an orientation and grasp of the responsibilities. She has made very good efforts to be a team player and to help others succeed in their work and care for patients.
>
> * * *
>
> I am pleased to have [Tatum] and her willing attitude as a part of the . . . department and Aurora . . . .

(*Id.*, Ex. 4, 86-87; Monahan Decl. filed Nov. 29, 2012 (Monahan Decl.) ¶ 2, Ex. 2.) (ECF Nos. 30, 30-2.)

As early as March 2008, when Aurora St. Luke's did not have an administrative assistant, Tatum also worked as an administrative assistant there at times. At Foster's request, Tatum did so twice in 2008, and again on July 2, 2009. When Tatum was assigned to both Aurora St. Luke's and Aurora Sinai, she continued to work the same number of hours. Foster engaged in efforts to have others perform some of the administrative assistant's work when

9

Tatum was performing both positions. In 2008, Foster gave Tatum two "Pat on the Back" awards for her willingness to cover the administrative position at St. Luke's.

In 2008 or 2009, the following individuals, who were African-American, worked or were students in the Department: Tatum (administrative assistant); Osita Oluigbo (chaplain intern); Edward "Steve" Ngugi ("Ngugi") (intern and chaplain resident); Ebenezer Insor (chaplain intern); Delana Patterson (chaplain resident); Joyce Thompkins (chaplain resident); Debra Weaver (chaplain intern); Deonna McIntosh (temporary administrative assistant); and Kevin Ori (chaplain).

On March 27, 2008, Foster gave Tatum a Performance Evaluation covering the date of her hire through December 31, 2007.[3] Tatum received a merit increase as a result of this Performance Evaluation. The review of Tatum rated her as more than fully competent to "provide personalized service," "address each person with dignity & respect," "be responsive," and "be a teamplayer . . . .[including] avoid[ing] placing blame or arguing." (Monahan Decl. ¶ 3, Ex. 3.) (ECF Nos. 30, 30-3.)

The March 27, 2008, performance review and planning form also included the following comments:

> [Tatum] does a good job in communicating about the status of projects generally. There is room for improvement to make this area a strength in terms of keeping various members of the department better informed on the status of the work. At times

---

[3]The March 27, 2008, performance review form is Bates-stamped AUR-LT 000299-000305, and attached as exhibit 24 to the Tatum deposition. The same document is also attached as exhibit three to the Declaration of Camille Monahan filed on November 29, 2012.

the communication is excellent. [Tatum] does an excellent job of greeting visitors to the office and making them feel welcome to the . . . [Department]. She has established very good relationships with many persons in other departments that she interacts with. There are some challenges in relating to some members of the [Department], where some have raised concerns about how she has responded to them. These have been occasions of tension within the [D]epartment and opportunities for improvement for all concerned. [Tatum] has been working with others to find mutually acceptable ways to understand and relate with one another, seeing that there is room for all to adjust to one another. [Tatum] is very good generally about fulfilling and completing tasks accurately. There have been some times where work was not completed as requested for meetings and some schedules have not been checked to make sure they are accurate before distribution. [Foster] support[ed] [Tatum] taking initiative to ensure accuracy in printed materials so there is less confusion and less irritation about mistakes on schedules.

* * * *

[Tatum] affirms diversity in the department and medical center. She has helped me and other staff be aware of the need for diversity and inclusiveness in the [D]epartment. She has been supportive and resourceful with the work of the Jewish chaplains and various spiritualities represented in patients, staff and students.

* * * *

[Tatum] has been adjusting to a new pattern at [Aurora Sinai] where more communication about a project's progress is expected than was the case with a previous employer who only wanted to know when a project would not be ready. At times, [Tatum] seemed to feel it was a reflection of a lack of faith in her abilities when persons have inquired about the status of a project. [Tatum] has made efforts to keep various members of the team better informed of the status of various projects. [Tatum] does an excellent job of keeping her work area presentable and professional in appearance. She has accepted responsibility to

11

help monitor effectively the use and ordering of materials in an orderly and accountable fashion.

* * * *

Tatum is adjusting to the many different persons in the [D]epartment and is working to adjust to support the needs of the new educational supervisor. This has been a challenge as this supervisor's style is different from [Foster's] style which [Tatum] had come to be [sic] expect from the early days of her employment in our [D]epartment.

Tatum has done a good job of coming into a complex environment and working with complex dynamics. There is room for development of processes and relationships within the [D]epartment to improve the flow of work, and I welcome [Tatum's] suggestions as to ways she can work with me and others more effectively.

(*Id.*)

The 2007 evaluation Tatum received on March 27, 2008, also included the following comments on the Job Standards form: "[Tatum] is very good with telephone contacts and visitors to the office making them feel welcome. There is some room for additional knowledge and responsibility in understanding how she might respond might respond [sic] to routine requests for information, and deal with situations when there are differences of opinion." (Tatum Ex. 27 (Bates-stamped AUR-LT 000021-000023)[4].) (ECF Nos. 24, 24-4.)

---

[4] The accuracy of this quotation could not be verified Tatum exhibit 27 – page 000022 is missing from the exhibit.

12

During the course of 2008, McCabe reported to Foster about issues that she experienced with Tatum, including that Tatum had said she would provide meeting minutes requested by McCabe when she (Tatum) finished preparing them rather than by McCabe's deadline, even though Tatum understood the preparation of minutes was a priority for McCabe. Tatum admitted that her response was not appropriate, but also stated that she was overwhelmed with McCabe's repeated questions. Tatum knew McCabe had reported to Foster about issues she was having with Tatum completing assigned work by McCabe's established deadline and a lack of communication from Tatum.

Because of recurrent issues between McCabe and Tatum, Foster discussed their respective roles and duties with them and created a Basic Working Guidelines document sometime in 2008. In July 2008, Foster was informed of an issue with scheduling a meeting room where Tatum had not provided the level of assistance McCabe thought was necessary.

In October 2008, McCabe gave Foster a "verbatim" account of a conversation she said had occurred between her and Tatum regarding a request by McCabe to Tatum. Foster believed Tatum had been rude and that she refused to do job tasks assigned by McCabe.

Rabbi Len Lewy ("Lewy"), who worked with the Department, also reported to Foster an issue he had with Tatum in November 2008 when he requested Tatum's assistance regarding a newsletter and arrangements for a program, and felt that Tatum responded inappropriately to his request.

13

Foster received reports from chaplain residents that Tatum rolled her eyes at McCabe when McCabe's back was turned and that Tatum spoke to McCabe in a rude tone of voice. The chaplain residents also reported issues they were having with Tatum.

In February 2009, Foster received reports from McCabe that Tatum did not provide assistance. In March 2009, McCabe reported to Foster that Tatum responded abruptly to her when asked about the status of the meeting minutes.

Tatum knew that Foster had received multiple complaints about her from multiple people. Foster perceived Tatum as having communication problems, evidenced by her reluctance to produce requested work and her rudeness to others. Foster did not place Tatum on a work improvement plan because he thought she knew her responsibilities and how to perform them, but was choosing not to do them.

In January 2009, Tatum met briefly with Lowery, who is African-American. Tatum talked to Lowery about Foster's and McCabe's treatment of her.[5] Lowery does not have any notes of the January 2009 meeting. Tatum believes that during the meeting she indicated that Foster was watching her and that McCabe was condescending towards her and unreasonable. Tatum believed at the time that she was being given unreasonable deadlines and that "it was more of micromanaging at this point than it was." (Ex. 6 (Mar. 9, 2012, Tatum Dep.), 55:17-19.) (ECF No. 29-6.)

---

[5]There is a dispute between the parties regarding whether Tatum told Lowery that Foster said, "look around, you don't fit in here," which Tatum took to be a race-based comment because she was the only black employee he supervised in the Department. (*See* Def.'s Reply Pl.'s Resp. PFOF, ¶¶ 26-27.)

14

Tatum claims that beginning in 2009, Foster often told her "look around, you do not fit in this department," and she did not ask Foster what he meant by this. Foster states he never made the comment. Prior to the time of Foster's alleged comments, he had received complaints about Tatum's performance. Tatum described McCabe as not being a good fit for the department because she did not have the first impression of kindness. (Ex. A (Mar. 9, 2012, Tatum Dep.) 86: 21-22.) (ECF No. 24-1.)

Foster began filling out his comments on Tatum's Job Standards Form for 2008 on March 31, 2009, after Tatum completed the self-evaluation portion of the form and sent it to him. His comments did not change after April 10, 2009.

Tatum met with Lowery on April 9, 2009,[6] because she did not feel that Foster was addressing her concerns about McCabe. Tatum told Lowery that she thought Foster was treating her poorly, was controlling, and was watching her from his office. Tatum raised abusive treatment complaints against Foster with Lowery on April 9, 2009.

On April 10, 2009, Lowery met with Foster about Tatum's concerns. Foster denied that Tatum's concerns were valid, but he responded to each of them and said Tatum was not performing her job. Foster "denied all allegations of treating her differently, based

---

[6]There is a factual dispute between the parties regarding whether in January 2009, Tatum presented a complaint regarding Foster's treatment of her to Lowery. The parties also dispute whether Tatum complained to Lowery prior to April 9, 2009, regarding Foster's treatment of her. (*See* Def.'s Reply to Pl.'s SMF ¶¶ 8-9.) (ECF No. 41.)

15

on race." (App. EEOC, Ex. 5, 42;17-18.)[7] Lowery's notes of the meeting, indicate that Foster stated that he was watching Tatum, "because of her tardiness/absences away from desk, eating at her desk, and eating in the cafeteria." (Ex. 9.) (ECF No. 30-9.) Foster also asserted that Tatum had poor communication in meetings, failed to take initiative to act independently, and had not announced visitors to the office in a professional manner. (*Id.*) Foster had not raised concerns about Tatum's behavior or performance with Lowery prior to being asked to respond to Tatum's complaint. (Ex. C (Apr. 20, 2012, Lowery Dep.) 142:20-23.) (ECF No. 24-3.)

Tatum acknowledges that Foster talked with her about some of his comments on her 2008 review before she received the review on April 17, 2009, including that he had received complaints from others about her, but denies that Foster raised issues about her job performance prior to the review. (Ex. A, 192:1-3.)

---

[7]Aurora responded to this proposed finding, in part, citing paragraph two of Lowery's supplemental declaration, wherein she avers:

> While I testified that Foster denied the allegations that he was treating Tatum differently based on her race, I did not tell Foster that Tatum was alleging different treatment based on her race, and Foster did not mention Tatum's race in denying her allegations. Instead, I asked Foster about the examples Tatum had provided, and he explained what had occurred. The information Foster provided me did not cause me to believe that he had done anything because of Tatum's race. As such, I considered Foster's explanations as a denial of Tatum's race allegations.

(See Def.'s Reply Pl.'s SMF ¶ 73.) However, paragraph two of the supplemental Lowery declaration runs afoul of what is commonly referred to as the sham affidavit rule. *See Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005) (stating "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions. . . . If such contradictions were permitted . . . 'the very purpose of the summary judgment motion–to weed out unfounded claims, specious denials, and sham defenses–would be severely undercut.'" *Id.* (citing *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996)).

16

The performance review Tatum received on April 17, 2009, covering January 1, 2008, through December 31, 2008,[8] may also include behavior beginning in 2008 and continuing into 2009 that did not meet performance standards. The performance review rated Tatum less than fully competent in many categories. Tatum also received the Job Standards form which is Bates-stamped AUR-LT 549-553, attached as exhibit 49 to the Tatum deposition. (ECF No. 24-5.)

On April 22, 2009, Tatum raised complaints with Lowery that Foster was treating her differently based on her race. Lowery asked Tatum for more specific examples about Foster's alleged discrimination because Lowery "couldn't possibly go to . . . Foster and just simply say, she believes you are treating her differently because of her race and not provide examples." (App. EEOC, Ex. 5, 138:15-141:17.) During the conversation, Tatum told Lowery that she thought the information on her review was false and she did not agree with it.

In 2009, Aurora had a process by which an employee could contest a performance evaluation. After talking to Lowery, Tatum utilized that process. On May 4, 2009, she submitted a rebuttal to the performance review[9] and a rebuttal to the Job Standards.[10]

_____

[8]The performance review that Tatum received on April 17, 2009, is Bates-stamped AUR-LT 000542-000548, and attached as exhibit 45 to the Tatum deposition.

[9]The performance review form is Bates-stamped EEOC000207-000213 and the rebuttal is Bates-stamped EEOC000214-000217; both are attached as exhibit 48 to the Tatum deposition. (ECF Nos. 24-4 & 24-5.)

[10]The Job Standards form is Bates-stamped EEOC000189-000193 and the rebuttal is Bates-stamped EEOC000194-000197; both documents are attached as exhibit 50 to the Tatum deposition. (ECF No. 24-5.)

17

Before Tatum submitted her rebuttal, Tatum believed that Foster had set unrealistic expectations for her, including that she complete projects within deadlines that she did not think were reasonable.

Lowery followed up on Tatum's April 22, 2009, internal race discrimination and retaliation complaint by speaking with Foster shortly thereafter. Foster "denied all allegations of treating her differently, based on race. He brought up again that she was not performing her job." (*Id.*, Ex. 5,142:16-19.) Lowery determined that Tatum's complaint was unsubstantiated, telling Tatum that "the word abuse can be subjective."[11] (Ex. 14, EEOC000442.) (ECF 31-4.)

On May 4, 2009, Tatum submitted a rebuttal to the performance review form.[12] Tatum also submitted a rebuttal to the job standards form on May 4, 2009.[13]

In May 2009, Foster asked Tatum about the status of a printer that was not working. Tatum responded, in a manner that Foster perceived as rude and disrespectful, that she did not know the status, and that "maybe this is information you can let me know about

---

[11]Aurora objects to this statement as hearsay. (Def.'s Reply to Pl.'s SMF ¶ 21.) However, the statement is not offered to prove the truth of the matter asserted; instead it goes to Lowery's state of mind at the time she was evaluating Tatum's complaints. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 716 (7th Cir. 2004).

[12]The performance review form is Bates-stamped EEOC 207-213 and the rebuttal is Bates-stamped EEOC 214-217; both are attached as exhibit 48 to the Tatum deposition. (ECF Nos. 24-4 & 24-5.)

[13]The job standards form is Bates-stamped EEOC 189-193 and the rebuttal is Bates-stamped EEOC 194-197; both documents are attached as exhibit 50 to the Tatum deposition. (ECF No. 24-5.)

18

since I have been out on vacation." (App. EEOC, Ex. 6, 224-225; Tatum Ex. 58; Foster Decl. filed Oct. 30, 2012, ¶ 33, Ex. Q.) (ECF Nos. 22 & 22-17.)

Aurora's Caregiver Discrimination Complaint Form, which was not required to be completed to make a discrimination complaint, was designed as a tool for employees to fill out directly and indicates, "[i]f you feel that you have been treated differently because of your age, race, religion . . . you may file a complaint." (Monahan Decl., Ex. 11). (ECF No. 31-1.) The policy on completion of discrimination complaint forms was perceived as a guide, and Lowery's actions in investigating Tatum's complaints were not unusual and were appropriate. Lowery's notes of her meetings with Tatum were one to two pages long, providing more detail than would have been possible in the limited space on the complaint form.

When Lowery spoke with Foster about Tatum's allegations of false information on her review, he denied them, explaining that the review was based on Tatum's failure to perform her job appropriately. Lowery's investigation of Tatum's rebuttal included having Foster provide information about the reasons why he had provided the comments he provided on Tatum's Performance Evaluation and Job Standards forms, with which Tatum took issue.

After talking with Tatum and receiving her rebuttals to the Performance Evaluation and Job Standards, Lowery reviewed Tatum's prior Performance Evaluations and concluded that Tatum's Evaluation for 2007 also noted several performance issues and that Tatum had received verbal warnings for prior incidents. Lowery received from Foster a detailed response to Tatum's rebuttals which she believed provided specific reasons and

19

incidents supporting Foster's comments on Tatum's Evaluation. During the time period that Lowery was dealing with Tatum, Lowery observed conduct she believed substantiated Foster's observations and experiences with Tatum and the behavior issues that Foster noted on Tatum's Evaluation. (Ex. C 178.); (Lowery Decl. ¶ 8.) (ECF No. 21.)

Lowery ultimately concluded that Foster's evaluation and behavior were not based on Tatum's race or retaliation. She thought Foster was more credible, in part because no one had complained about him before, and she did not believe that Tatum understood what was expected of her. Based on her conversations with Tatum, Lowery concluded that Tatum did not believe she had done anything wrong, because Tatum so insisted and never identified anything she could have done differently in situations where her behavior was questioned. Based on her observations, Lowery felt that Tatum would not be willing to accept assistance because she understood Tatum believed she was not the problem, and that others were.

Tatum spoke with Lowery about the rebuttal to her Performance Evaluation on May 26, 2009, and Lowery told Tatum that she did not see abuse, but instead believed that Tatum did not understand her job. Tatum raised additional complaints regarding Foster. Tatum took contemporaneous notes of the meeting, and added some notes shortly after the meeting.

On May 29, 2009, Tatum met with Lowery to complain about Foster's treatment of her. Lowery's investigation into the complaint revealed that Foster had changed Tatum's paid time off ("PTO") from scheduled to unscheduled and that it should be changed back to

20

scheduled.  Lowery perceived Foster's change of Tatum's approved PTO to unscheduled as evidence of retaliation.

Lowery, Foster, and Tatum met on June 9, 2009,[14] and July 22, 2009.  Tatum took contemporaneous notes of both meetings, and added to them shortly after the meetings. Lowery referred to the June 9, 2009, meeting as a relationship builder that would allow Foster and Tatum to improve communication[15] and figure out how to move forward in their working relationship.  Lowery also stated that "the leader has the final say regardless, if employees have complaints."[16]  (Ex. 15, EEOC000464.) (ECF No. 31-5.)  Lowery decided that Foster should revise Tatum's Job Standards in order to clarify his expectations, because Tatum thought she was doing an exceptional job and Foster did not.

On June 30, 2009, Tatum filed a charge with the EEOC asserting that Aurora discriminated against her on the basis of race, on the basis of retaliation for opposing discrimination practices, and on the basis of subjecting her to different terms and conditions of employment by denying her a merit wage increase.

_____

[14]There is a factual dispute between the parties regarding whether during the meeting Lowery made a statement that "[Tatum] being black and [Foster] white, [Tatum] takes things differently that he does."  (*See* Def.'s Reply to Pl.'s SMF ¶ 23 (quoting Ex. 5 at EEOC000464.) (ECF No. 31-5).)

[15]Aurora objects to this statement as hearsay.  (Def.'s Reply to Pl.'s SMF ¶ 23.)  However, the statement is not offered to prove the fact ot the matter asserted; instead it goes to Lowery's state of mind at the time she was evaluating Tatum's complaints. *See Luckie,* 389 F.3d at 716.

[16]Aurora objects to this statement as hearsay.  (Def.'s Reply to Pl.'s SMF ¶ 24.)  However, the statement is not offered to prove the fact ot the matter asserted; instead it goes to Lowery's state of mind at the time she was evaluating Tatum's complaints. *See Luckie*, 389 F.3d at 716.

21

In June or July 2009, Tatum met with Foster and Lowery and was told to to ask McCabe daily what she needed help with.

On July 2, 2009, Tatum again began covering the Aurora St. Luke's administrative assistant position. At one point Tatum shared with Foster that she was overwhelmed. Until Tatum's employment was terminated, she continued to work her own job and cover that of the Aurora St. Luke's administrative assistant.

Diane Ekstrand ("Ekstrand"), Aurora's Vice President of Human Resources, received notice of Tatum's EEOC charge on July 13, 2009. As was standard practice, Ekstrand forwarded the charge to Lowery so that Lowery, the site human resources director, could begin the onsite investigation of the complaints raised in the charge.

On July 13, 2009, Foster forwarded to Tatum a revised Job Standards form for 2008 to clarify his expectations. Regarding Tatum's inconsistent application of Aurora's values of accountability, teamwork and respect, the revised Job Standards included the following example:

> An example of this occurred during a recent [Aurora Sinai] site department meeting where we were discussing the upcoming Wellness Fair. During that discussion you indicated that the Wellness group was planning on using the Meditation Room for an event offering. In response, I indicated that the Mediation [sic] room was reserved for use by patients and families for prayer and meditation. Your response was to protest and indicate that there was a shortage of space and the Meditation Room was going to have to be used. When I reminded you that there was a policy that governed and limited the use of Meditation Room, you became insistent that the room would be used for the Wellness Fair.

> In this situation, I expect you to accept additional information about policy and practice and be a team player in helping to understand the larger picture, given information you may not have been aware of. In the future, I expect that you will check with me regarding use of space under supervision of the Spiritual Care Department to ensure that planned uses will be consistent with department policy and practice.

(Tatum Ex. 72, AUR-LT 000709.) (ECF No. 24-5.) Tatum responded that the additional information was dishonest and, in particular, indicated that Foster's description of her response to him was inaccurate. At his September 7, 2012, deposition, Foster agreed that the example should have referred to Caregiver's Week, not the Wellness Fair, and that he was confused about the incident because he had no documentation of it.

Lowery investigated whether Tatum had acted inappropriately at the meeting referenced in the revised Job Standards. From her investigation, Lowery found that Foster had referred to the Wellness Fair in error, and that his discussion with Tatum actually occurred during Caregivers Week. However, Lowery's investigation confirmed that, while Foster had the wrong event, his description of what happened was accurate.

On July 14, 2009, Lowery learned that Tatum had filed a complaint with the EEOC based on her Performance Evaluation. On July 20, 2009, Ekstrand met with Lowery to discuss Tatum's EEOC charge.

In July 2009, chaplain Jana Troutman ("Troutman"), reported to Foster that Tatum had not provided her with requested assistance. Troutman also told him that she had

23

invited Tatum to lunch to try to address the situation and that Tatum had accepted the invitation but failed to appear at the lunch.

On July 22, 2009, Lowery met with Foster and Tatum to review the expectations in the revised Job Standards Foster had provided to Tatum, which state, "[p]ersonal disagreements or conflicts are handled privately, discreetly, and respectfully." (Ex. 21, AUR-NSF 000256.) (ECF No. 32-1.) Lowery interpreted the foregoing language as meaning that concerns would not be raised in public. Tatum says that after the July 22, 2009, meeting, Foster told her that "privately, discreetly, and respectfully" meant that "Foster wanted [Tatum] to come to him and not to HR." (Tatum Dep. 342: 21-25.) She states that Foster also said, "basically I need you to come to me and talk to me before you go to HR," and that he, "just said, come talk to him before I go to HR." (*Id.* at 343: 15-16.) Tatum told Foster she was not comfortable with that and she would go to human resources if necessary.

On August 27, 2009, McCabe reported to Foster that in response to a request that Tatum hole-punch documents Tatum told McCabe that the task had been previously assigned to chaplain residents, that she did not want to do the task, and that if McCabe put the documents in her mailbox, Tatum would put them in McCabe's[17] mailbox. Tatum later acknowledged the incident and stated that her response was inappropriate. Tatum testified that she felt overwhelmed at the time.

---

[17]It was subsequently clarified that Tatum said that she would put the materials in Foster's mailbox.

24

During an August 27, 2009, morning meeting, or "huddle," with three chaplain residents, Ngugi, Joyce Lawlor ("Lawlor"), and Andrew Barkley ("Barkley"), Foster asked Tatum for assistance preparing a graduation program. Tatum responded, in what Foster perceived as a rude, loud and inappropriate manner, that she would like to discuss it with him later. A few days later, Foster received a report from chaplain Norma Barr ("Barr") that Tatum had hung up on her twice when she called to ask for McCabe's phone number.

On August 28, 2009, the EEOC called Ekstrand's office to set up the mediation of Tatum's discrimination and retaliation charge.

Lowery met with Foster on September 8, 2009. He told her of the incidents involving McCabe, himself, and Barr, and later that day Lowery initiated an investigation into Foster's allegations that Tatum had behaved inappropriately. Lowery spoke with Barr and concluded that Barr's version of the phone hang-ups was correct. Lowery also spoke with McCabe about the incident regarding the hole-punch assignment.[18] Based on the information she received, Lowery understood that McCabe did not assign a deadline for hole-punching the documents. However, Tatum was refusing to do the task even though it was within her job description.

---

[18] No date is provided for Lowery's conversation with McCabe regarding the hole punching incident. However, paragraph 15 of Lowery's declaration states that she was on vacation beginning August 24, and returned September 8, 2009.

As of September 11, 2009, based on the information that Lowery had compiled, she recommended that Tatum receive a First-Step discipline and a formal EAP (Employee Assistance Program) referral.

On September 14, 2009, McCabe sent Lowery a document detailing complaints she had received from chaplain residents regarding Tatum and incidents between Tatum and herself, including one that day when Tatum reportedly had not assisted McCabe with a request for a schedule. On September 16, 2009, Lowery received an email from Foster, providing a "narrative" of events from August 25, through August 27, 2009. Lowery also reviewed the graduation program that Foster had asked Tatum to create,and concluded that Foster's estimate that the task would take one hour to complete was reasonable.

On September 16, 2009, Aurora and the EEOC finalized the September 22, 2009, date for the mediation of Tatum's EEOC charge.

On September 16, 2009, Gail Buenger ("Buenger") Aurora's Vice President of Operations and Foster's supervisor, emailed Foster stating, "[w]e need to help [Tatum] find her next opportunity. Please make that clear to [Lowery] & ask for her help to make this happen as quickly as possible!" (Monahan Decl. ¶ 23, Ex. 23 at AUR-NSF 000019.) (ECF Nos. 32 & 32-3). Foster shared "this" with Lowery. (App. EEOC, Ex. 4 (Foster Dep.) 215-16.)[19]

---

[19]There is a dispute regarding whether the email was forwarded by Foster to Lowery. (Def.'s Reply to Pl.'s Supplemental Findings of Material Fact ¶ 38.) The dispute is not material, because it is undisputed that Foster shared the information with Lowery.

On September 21, 2009, Tatum met with Lowery and Foster to discuss the August 26, 2009, exchange between Tatum and McCabe, and the August 27, exchange between Tatum and Foster. During the meeting Tatum repeatedly told Lowery that Foster's statements about her behavior on August 27 were not accurate. Tatum felt "harassed and threatened during the meeting."[20] (Ex. 29.) (ECF No 32-9.)

Lowery spoke with Lawlor, one of the chaplain residents who observed the exchange between Foster and McCabe at the August 27, 2009, huddle. Lawlor confirmed that she thought Tatum had been disrespectful to Foster.

On September 21, 2009, Foster emailed Lowery with names of additional witnesses to the interaction between himself and Tatum at the huddle stating, "I hope this is helpful to you in gathering background regarding this incident." (Lowery 135:22-136:3; Ex. 25.) (ECF No. 32-5.) Lowery interviewed Ngugi, identified by Foster as witness to the interaction between himself and Tatum at the huddle. Lowery's notes from her interview with Ngugi state:

> • Can't remember if Ed referenced the need to change schedule because of [Tatum] (unaware);
>
> • Rescheduled before for a number reasons LOA's etc.
>
> • Do recall [Tatum] stating she was pressured to do something in a short time frame.

---

[20]Aurora objected to the portion of paragraph 46 of the EEOC's SMF which states Tatum felt "harassed and threatened during the meeting," as inadmissable hearsay. However, the statement is admissible as reflecting Tatum's state of mind during the meeting, *see Luckie*, 389 F.3d at 716, not that she was actually harassed and threatened.

• Time to time witnessed similar interactions thought that was how they communicated.

• [Tatum] "sets her boundaries" - a lot of work having to cover two sites - stated to? "it is little too much"

• Would not say it was "rude behavior" remember her telling him she was feeling overwhelmed.

(Monahan Decl., Ex. 26.) (ECF No. 32-6.)  Lowery's notes of her interview with Ngugi were accurate.

Lowery prepared a timeline of Tatum's employment which was used at the September 22, 2009, mediation of Tatum's EEOC charge.[21]  The timeline states: "Spoke with . . . Ngugi, Resident Chaplain who was witness to [Tatum's] behavior during the huddle. [Ngugi] could not remember the interaction.  Stated [Tatum] had shared with him that she was feeling the pressure to perform her job and cover both sites."  (App. EEOC, Ekstrand Depo. 80:21- 81:1; 82:5-15 (ECF No. 29-3); Ex. 27 at AUR LT 258.) (ECF No. 32-7.)  Aurora used the timeline with the inaccurate description of Ngugi's interview to prepare for the mediation of Tatum's EEOC charge.  It was used as part of the explanation for Tatum's termination on her termination memo.

On September 22, 2009, Lowery and Ekstrand attended the mediation of Tatum's EEOC charge.  After an hour to an hour and a half, the mediation was adjourned for 30 days and never reconvened.

---

[21]There is a dispute between the parties regarding when the timeline was finalized.  (Def.'s Reply to Pl.'s SMF ¶ 43.)

On September 25, 2009, Tatum sent Lowery an email and attached document, which stated in part, "Iris mentioned on Friday September 17, 2009 that I did not have to make a comment if I choose to. I choose not to." (Monahan Decl., Ex. 29.)

On September 28, 2009, Lowery sent Foster an email with the subject line "Update (Becker & Tatum)" and the body of the email read, "I am meeting with Diane on Wednesday AM. I will plan to talk with you when I return to the office." (Monahan Decl., Ex. 37.) (ECF No. 33-7.)

On September 30, 2009, Lowery spoke with Barkley, one of the chaplain residents who observed the August 27, 2009, exchange between Foster and Tatum. Lowery determined that Barkley corroborated that Tatum's behavior toward Foster was inappropriate. Based on her investigation, including the reports from Foster, Lawlor, and Barkley, Lowery found that Tatum had inappropriately communicated with Foster in a loud, abrupt and unprofessional manner on August 27, 2009, when he requested that she work on the graduation program.

In September and October 2009, Foster received additional reports that Tatum was not providing assistance and had several interactions with her in which he thought she acted disrespectfully.

After completing her investigation, Lowery determined that Tatum's conduct was inappropriate, and she and Foster decided to discharge Tatum.[22] The decision to discharge

---

[22]There is a factual dispute regarding whether Buenger and/or Ekstrand were also involved in the decision to discharge Tatum from employment. (Def.'s Reply to Pl.'s Resp. to Aurora's PFOF ¶ 80.)

Tatum was based not only on the August incidents themselves, but also on the fact that they were the continuation of a pattern of incidents where Tatum demonstrated similar rude behavior, and because, despite counseling on how and when her work should be done, she chose not to perform her job.

On October 2, 2009, Lowery and Foster, met with Tatum to inform her of the decision to terminate her employment. During the meeting, Tatum was given a termination memo. The relevant paragraphs of Tatum's termination memo are as follows:

> On Thursday, August 27, 2009, during the department huddle that included chaplain residents, I provided you with a handwritten draft of the program for the graduation for the residents and said that I would like for you to prepare the program for me. You responded by saying, "you will have to talk to me about this later" in a loud and abrupt manner that was unprofessional and you quickly left the room. I along with others was stunned by your response because your response was not in line with Aurora's Values Accountability, Teamwork and Respect. When I later asked you what your concerns were about the assignment, you stated that you felt overwhelmed and that you needed one week to complete the program, I responded that I believed the program could be completed in about one hour and asked that you continue to work on this and to do the best you could. You were then instructed to email me either the finished program or a draft of the program. You completed the revisions of the certificates for which I thanked you for your work and stated that I thought the certificates looked great which you had no response.

> On August 27, 2009, you were asked by . . . McCabe, CPE Coordinator to punch holes and file the reviewed Chaplain Referral Forms in the notebook, which is considered part of your role as an Administrative Assistant. You responded to [McCabe] that the students completed this task. When [McCabe] explained that she had not asked the students to do this and that there were several of them that needed to be filed, you stated the students

have always done this in the past. [McCabe] agreed with you that the students had completed this task in the past and asked you again to assist with filing the completed forms. You responded by asking [McCabe] to do it. [McCabe] explained to you that she needed to attend a meeting and would place the forms in your mailbox to file and you responded that you would put them into her mailbox.

The organization's service standards have expectations for employee's behavior and Aurora's Values Accountability, Teamwork and Respect. You displayed behavior that was not in line with the Aurora Service standards and Values and failed to take initiative to support your coworkers and not following reasonable instructions.

You have been coached repeatedly for disregarding these expectations.

(Ex. 28.) (ECF No. 32-8.)

The termination memo given to Tatum was reviewed by Foster, Lowery, and Ekstrand and accurately states Aurora's official explanation for Tatum's termination.

The alleged inappropriate behavior on August 26, and August 27, 2009, was deemed misconduct by Foster who coded Tatum's termination as misconduct on Aurora's internal forms.

Tatum received a thank-you note from Foster for the graduation program referenced in her termination memo. Lowery indicated that Tatum probably did a great job on the graduation certificates assignment.

Aurora maintains that Tatum was discharged for continuing to demonstrate behavior that was contrary to Aurora's values and service commitments and for failing to

31

follow reasonable instructions of her supervisor and others she was supporting. Lowery did not give Tatum a final warning prior to discharging her because Lowery believed that Tatum's behavior was impacting the entire department, not just Foster, and did not believe Tatum's behavior could be remedied because Tatum took no accountability and continually blamed others for her behavior.

Lowery did not consider additional training for Tatum because Tatum never indicated that she was interested in training, believed she was doing an excellent job, and felt the problems were her supervisor's issue. Tatum did not have problems with absenteeism or tardiness. During the course of Tatum's employment in the Department, she never received a performance improvement plan, a written warning, or any kind of discipline.

Lowery knew that at some point Tatum had communicated to Foster that she did not feel safe speaking with Lowery. Lowery did not alert Tatum to Aurora's policy, which gives an employee the right to speak to a different human resources manager when the employee does not want to speak to the onsite human resources person.

Tatum filed a complaint with the EEOC on October 5, 2009, regarding conduct that occurred between September 21, 2009, when she was asked to provide a statement relating to the August 26, 2009, exchange between herself and McCabe and the August 27, 2009, exchange between herself and Foster, and her October 2, 2009, discharge.

Tatum did not file a lawsuit after receiving a February 25, 2011, Dismissal and Notice of Right to Sue from the EEOC regarding the first charge she filed in June 2009,

alleging that she received a negative Performance Evaluation because of her race and in retaliation for complaints she made.

### Discipline of Other Employees

The EEOC has identified a chaplain and resident chaplain it says received more favorable treatment than Tatum. Both the chaplain and the resident chaplain are Caucasian.

The primary responsibilities of Herbert Becker ("Becker"), a chaplain, were to visit patients and provide spiritual care and emotional support, to support the pastoral education program, and to provide on-call spiritual care services. Unlike Tatum, his job description did not include as specialized know-how and requirements a demonstrated ability to tactfully and effectively communicate (written and verbal) with a variety of individuals.

In 2008, Foster noticed that Becker was behaving toward one of the chaplain residents in a "loud and dominant manner," (Foster Dep. 27: 12-13), and when that behavior continued and became more frequent, Foster documented giving Becker verbal warnings in April and May 2008. On July 9, 2008, after Foster observed a change in Becker's behavior, and there were a series of incidents involving anger management issues that Foster thought might be related to stress,[23] Foster gave Becker a performance improvement plan for behavior. The inappropriate behavior identified in the performance improvement plan was (1) the "[f]ailure to manage expression of anger in an appropriate manner with individuals and group[s] within the department" including disrupting and ending a meeting to discuss a model

---

[23]There is a dispute between the parties regarding Foster's belief as to the source of Becker's stress. (Def.'s Reply to Pl.'s Resp. PFOF ¶ 87.)

33

blessing service; anger which intimidated McCabe and CPE students; an angry email to Foster on May 22, 2008, and an angry confrontation with a staff person over the on-call schedule and (2) the "[f]ailure to be a team player and to provide reasonable communication about important matters." (Ex. 34.) (ECF No. 33-4.) Foster worked with Buenger to draft the performance improvement plan issued to Becker. Lowery had no input or involvement in Becker's work improvement plan.

On October 1, 2008, Foster issued Becker a second step written warning for behavior that was a "direct violation of Aurora's values accountability, teamwork, and respect, Service Standards and Aurora's work rule discourtesy." (Ex. 35, EEOC000064.) (ECF No. 33-5.) The second step written warning noted that on different occasions Becker had used profane language in an angry conversation with a coworker, repeatedly used the word "bullshit" and hung up on another coworker, and called his supervisor, Foster, names in the public areas of the hospital. Becker had called Foster "Edolf [sic]" and a "control freak" after Foster approached Becker about using vulgar language in a conversation with another employee. The second step written warning given to Becker stated that Becker, "had been counseled on two occasions regarding his language and managing his anger on 2/28/2008 and on 7/9/2008." (*Id.*)

Becker refused to read his performance improvement plan or second step written warning stating that he threw both away as soon as he received them, and that he believed the requirement to consult with the employee assistance program was a "waste of time." (App.

34

EEOC, Ex. 1 (Becker Dep.), 103:23-104:13.) (ECF No. 29-1.)  Becker was so loud and angry during the second step written warning disciplinary meeting that a human resources assistant asked if everything was okay.  There is no evidence that either Lowery or Foster was aware of this behavior by Becker.  Becker's employment was not terminated.

Foster was given discretion to decide the appropriate approach to disciplinary issues and developed a standard whereby he documented a verbal warning when a situation became more significant, and would document coaching and counseling on a performance improvement plan if he was going to refer the supervisee to consult with someone or attend a class.  Lowery believes it was fair and appropriate that Becker was not discharged, whereas Tatum was, because Aurora will work with individuals whose behaviors do not align with its values and service commitments, to help bring those behaviors into alignment, as long as those individuals take accountability for their behaviors and are continuing to perform their job duties.  Lowery had no knowledge of Becker refusing to do assignments that Foster requested, whereas she felt Tatum was choosing not to perform her duties.  Foster did not view Tatum's situation as similar to Becker's because Tatum refused to perform her job duties and was repeatedly rude, disrespectful, and unprofessional, whereas Becker performed his job duties, but had emotional issues that Foster thought related to some personal experiences.

The EEOC has also identified a white chaplain resident, William Beversdorf ("Beversdorf"), in Aurora's one-year chaplaincy program who received a work improvement plan but was not discharged, as being treated more favorably than Tatum.  Foster supervised

35

Becker, Tatum, and Beversdorf. "Ultimately, [Foster] was [Beversdorf's] supervisor according to the Aurora system, but [he] delegated his direct supervision to the Reverend Dr. William Tallevast ("Tallevast")," the chaplain educator at Aurora St. Luke's. (App. EEOC Ex. 4 (Foster Dep.), 68:21-23.)

On April 24, 2008, Foster gave Beversdorf a documented verbal warning for not attending meetings on time, and his behavior and communication style with a significant donor of the hospital. On May 7, 2008, Foster gave Beversdorf a documented verbal warning for inappropriate interactions with a female cafeteria worker that the worker found embarrassing. Foster took notes of a verbal warning that Tallevast gave Beversdorf.

On May 30, 2008, Beversdorf received a performance memo signed by Foster and Tallevast setting forth four concerns: failure to engage in personal counseling that was part of Beversdorf's acceptance into the chaplain residency program, being tardy to a meeting with a donor and engaging in unbecoming conduct at that meeting, making inappropriate comments to a female cafeteria worker, and engaging in inappropriate personal behavior with a female physician in the cafeteria while Beversdorf was working. (Ex. 45.) (ECF No. 34-5.) There were some concerns that the incident with the cafeteria worker "might" be sexual harassment. (App. EEOC, Ex. 4, 70:15-71:4; Ex. 45.) The May 30, 2008, performance memo cites three rules that Beversdorf violated: "1. Workplace behavior including inattention to duties while on duty, including but not limited to, sleeping. 2. Gambling, horseplay, or other inappropriate workplace behavior, which creates a disturbance or hazard, and 3. Stopping

36

working before time specified, overstaying rest or lunch periods, or leaving the job without permission during regular assigned working hours." (Ex. 45.)  The performance memo states that "[f]ailure to show improvement may lead to disciplinary action up to and including termination."  (*Id.*)

Aurora anticipates that its students may at times need to learn about behavior that might not be considered appropriate, and when Foster learned of the issues with Beversdorf, he believed that a work improvement plan was appropriate to bring the issues to his attention and provide him training.

In Aurora's official response to the Wisconsin Department of Workforce Development Unemployment Insurance ("DWD UI") claim, Lowery stated that Tatum's employment was terminated for misconduct.[24]

In a written response dated October 19, 2009, from Lowery to the DWD UI claims investigator, Lowery stated that she and Foster discharged Tatum for "Misconduct–Repeated gross violations of Aurora's Value and Service Standards."  (Monahan Decl., Ex. 32.) (ECF No 33-2.)  In the portion of Aurora's response requesting information with respect to any prior incidents, Foster stated, in part, that "[s]ince 2008, . . . Foster has received multiple complaints about . . . Tatum's behavior towards the chaplain residents and chaplain

---

[24]There is a genuine dispute of fact regarding whether after the termination of Tatum's employment, Lowery spoke with the DWD UI claims investigator.  (*See* Def.'s Reply to Pl.'s SMF, ¶¶ 54, 56.)  Aurora also asserts that the DWD UI document that provides the basis for the EEOC's proposed findings is inadmissible hearsay.  However, with proper foundation the documents may fall under the business record exception, Fed. R. Evid. R. 803(6), and Lowery's purported statements would not be hearsay because they are statements of a party opponent.  Fed. R. Evid. R. 801(d)(2).

staff where she *sometimes* refused to perform duties of an Administrative Assistant for certain

staff members and responded inappropriately towards coworkers." (*Id*.) (emphasis added.)

> At her April 20, 2012, deposition, Lowery testified:

> Tatum was insubordinate and . . . failed to perform her duties.
> Again, we can work with individuals whose behaviors, such as,
> how they communicate or how they interact with, do not align
> with our values and service commitment, as long as they are
> continuing to perform other parts of their job. We cannot
> counsel, send a person to classes, if they choose not to do their
> job, at all. That's not something we can remedy.

(Lowery Dep. 122:14-25.)

On February 3, 2011, Lowery told the EEOC investigator that she "believes that

[Tatum was treated] no differently than Becker. States that [Tatum] was given more chances

to improve her performance but failed to acknowledge that the performance issues she was

having were her own." (Ex. 49.) (ECF No. 34-9.)

At her April 20, 2012, deposition, Lowery testified that she believed Becker and

Tatum were not treated differently. (Ex. 5 (Lowery Dep.), 194.) Lowery testified that Tatum

had a blind spot and Becker did not. Becker "acknowledged [he was swearing at people]. He

never denied it." (*Id*. at 156.) Lowery testified that a "verbal warning is simply that, a verbal

warning, but we would ask a manager to document the conversation with the caregiver and

that information would be kept typically in the department file." (*Id.* at 29:2-5.)

On December 24, 2011, Aurora responded to the EEOC's Interrogatory No. 5,

seeking the identities of each individual who participated in the decision to terminate Tatum,

by identifying: Buenger, Vice President of Project Management; Ekstrand, Former Vice President of Human Resources; Foster, Director of Spiritual Care; and Lowery, Director of Human Resources Services.

At her August 22, 2012, deposition, Buenger testified that she was not involved in the decision to terminate Tatum's employment. However, Buenger also testified that she received from Foster the narrative email he forwarded to Lowery regarding the incident on August 27, 2009.

At Foster's September 7, 2012, deposition, he testified that "It was a decision that I think was made beyond [Lowery]. . . I would assume that in this kind of situation that she was consulting with others as well just as I was." (App. EEOC, Ex. 4, 214:19-215:3.)

At her August 12, 2012, deposition, Ekstrand testified that she was not involved in the decision to terminate Tatum. Lowery had a conversation with Ekstrand about appropriate next steps for Tatum and Ekstrand reviewed the termination memo before it was given to Tatum. Ekstrand provided consulting and guidance to Lowery, and Lowery provided consulting and guidance to Foster.

On May 8, 2012, the EEOC sent its second set of interrogatories. Aurora answered on June 8, 2012, responding to Interrogatory No. 13, "Identify by Bates Number all documents that Aurora contends are documentation of verbal warnings . . .Foster gave to . . . Tatum," as follows "Defendant objects to this Interrogatory on the grounds it is vague. Subject to and without waiving the foregoing objections, Defendant states that the following

39

documents regard issues . . . Foster had discussions with Tatum about." (Monahan Decl., Ex 38.) (ECF No. 33-8.) Aurora identified either 338 or 343 pages of documents in its response.[25]

At her August 10, 2012, deposition, Ekstrand testified that a verbal warning occurred when "a leader would sit down and verbally share with an employee their concerns about their performance and ways to develop that skill," and that she encouraged that the verbal warning component be documented (App. EEOC, Ex. 3, 38:20-22.) She also testified that "[w]e encouraged documentation around any performance, coaching, discipline, separation." *(Id.* at 39:1-2.)

At Foster's September 7, 2012, deposition, he testified that verbal warnings happen "where someone is told that their performance is not meeting standards and they need to improve. . ." and that he documented verbal warnings when the underlying performance issue "became more significant or more directive." (App. EEOC, Ex. 4, 21:14-22:11.) In 2008, Foster gave Tatum between five and ten verbal warnings, and he did not have "a great deal of documentation for that." (*Id*. at 104:9-17.) Foster explained that he did not document the issues in 2008 because, given Tatum's performance previously as a good employee, he expected that things would turn around.

According to Foster, his statement in Tatum's April 17, 2009, Performance Evaluation, "[t]his has been a year where several basic repetitive tasks have been done well and consistently. There are also regular administrative tasks that have not been done or have

---

[25]There is a dispute as to the number of pages that Aurora identified. (*See* Def.'s Reply to Pl.'s SMF ¶ 76.) The dispute is not material.

40

not been done consistently," (*Id.* at 132:8-17), referred to Tatum ceasing to perform her regular administrative functions for the six months prior to Foster giving Tatum the Performance Evaluation. Foster did not think the incidents referenced in the April 17, 2009, report "in and of themselves" were grossly significant and he thought verbal warnings and a less formal approach were warranted because Tatum previously had demonstrated an ability to do her job. (*Id.* at 132:1-7.)

On September 12, 2012, Aurora supplemented its response to the EEOC's Interrogatory No. 13 as follows "Defendant objects to this Interrogatory on the grounds it is vague. Subject to an[d] without waiving the foregoing objections, Defendant states that the following documents regard issues . . . Foster had discussions with Tatum about." (Monahan Decl., Ex. 42.) (ECF No. 34-2.) Aurora identified 237 pages of documents in its response, some of which were duplicates of documents produced in response to the initial request.

On November 26, 2012, EEOC attorneys created a summary of the documents that Aurora identified as being responsive to EEOC's Interrogatory No. 13. Those documents included performance evaluations, emails between individuals that did not include Tatum, emails to Tatum from individuals who were not Foster, notes of Tatum's complaints about Foster to Human Resources, and an email from Foster to Tatum telling her that the meeting minutes looked great. Only four of the identified documents seemed to be documentation of a verbal warning given by Foster to Tatum: AUR LT 508 (4/1/2008 "hand written note recounting conversion between author (unknown) Tatum and Foster re: Tatum keeping track

41

of hours worked"), AUR LT 1862 (7/16/2009 email about over-time), AUR NSF 512 (8/7/2009 email about over-time),[26] and AUR NSF 587-588 (12/23/2008 email about entering "PTO.") (Ex. 39-41; Ex. 50-51) (ECF Nos. 33-9; 33-10; 34-1; 34-10; 35-1.)

Lowery testified that the "shift in philosophy," to emphasize working more collaboratively and more respectfully, was initiated in September 2008, prior to the October 2008, second step written warning issued to Becker for using profane language when interacting with his coworkers. Lowery also testified that it takes time to implement a shift in philosophy.

On June 11, 2012, Aurora responded to the EEOC's Request for Production No. 27, requesting documentation of the "shift in practice" by stating: "Defendant states that there was no new written 'policy' on employee behavior implemented, but it will produce at a mutually agreeable date and time two communications from Nick Turkal[27] that . . . Lowery received regarding what . . . Lowery interpreted as a change in philosophy." (Ex. 46, 3-4.) (ECF No. 34-6.) Aurora supported its assertion of a "shift in practice" by producing copies of two electronic newsletter articles, one dated September 8, 2008, and the other dated August 24, 2009.

---

[26]The Court has corrected the date of this e-mail from 8/17/09 to 8/7/09, the date listed in the EEOC's summary report.

[27]Nick Turkal, M.D., is identified as Aurora's President and Chief Executive Officer. (*See* Monahan Decl., Ex. 47.) (ECF No. 34-7.)

42

The September 8, 2008, article states in part:

> At Aurora, good behavior should not be reserved for patients. We also need to work with each other in respectful ways. There is simply no room in a place of healing for rudeness, obstinacy, and territorialism. As professionals dedicated to putting the patient at the center of all that we do, we need to treat every coworker, regardless of their role or title, with respect and dignity. Until we can do this, every day, with every interaction, patient-centered care will be very difficult or even impossible to provide.

(Ex. 47.) (ECF No. 34-7.)

The August 24, 2009, article states in pertinent part:

> The final component of our value equation is the patient experience. Our recent patient loyalty and satisfaction scores show us making some progress, but we have much more work to do here. Poor patient experiences, specifically if they are the result of inattentive or even rude behavior on the part of caregivers, are unacceptable . There is no other way for me to say this: We must change our culture of patient service throughout the organization and do it urgently, every day at every touch point.

(Ex. 48.) (ECF No. 34-8.)

Foster testified that the "shift in emphasis" represented by the newsletters did not prevent him from sending employees to classes, issuing warnings, or using the discipline system to address performance or conduct problems.  (EEOC App., Ex. 4 24:11-25:4; 204:23-205:17.)  Foster's perception is that coaching and counseling at Aurora is an umbrella term including verbal warnings and performance improvement plans, though the words verbal warnings and verbal counseling were also used interchangeably.  Buenger testified that performance improvement plans are coaching and counseling.

43

**Analysis**

A plaintiff in a Title VII discrimination case may proceed under the direct method or the indirect method of proof. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). The EEOC states that with respect to the race discrimination claim it is proceeding under the indirect method of proof. Aurora states that the EEOC cannot establish a *prima facie* case of race discrimination, and even if it could, the EEOC cannot refute its legitimate non-discriminatory reason for terminating Tatum's employment.

***Race Discrimination***

Under the indirect method, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably. *Atanus,* 520 F.3d at 672-73. If a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant "to produce a legitimate, noninvidious reason for its actions." *Id.* at 672. If the defendant satisfies its burden of rebutting the *prima facie case*, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's reasons are false and a pretext for discrimination. *Id.* In this context, a pretext is "a lie, specifically a phony reason for some action." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

44

Aurora does not contest the first and third elements of a *prima facie* case of discrimination. However, Aurora contends that Tatum did not meet its legitimate expectations and the EEOC has not presented evidence that Aurora treated other employees who were outside the protected class more favorably.

*Legitimate Expectations*

When considering whether an employee is meeting legitimate expectations, the Court looks to whether the employee was performing adequately at the time of the adverse employment action. *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009) (citing *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1262 (7th Cir. 1993)). An employee who violates her employer's established policies fails to perform adequately or meet her employer's legitimate expectations. *See Anders v. Waste Mgmt. of Wis., Inc.*, 463 F.3d 670, 676 (7th Cir. 2006). The proper inquiry mandates looking at the employee's job performance through the eyes of her supervisors at the time of her termination. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008).

Although indicators of past conduct can be relevant to the question of whether an employee is meeting legitimate expectations, such indicators cannot "demonstrate the adequacy of performance at the crucial time when the employment action is taken." *Fortier v. Ameritech Mobile Comuns. Inc.*, 161 F.3d 1106, 1113 (7th Cir.1998); *see also Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("In most cases, when a district court evaluates the question of whether an employee was meeting an employer's legitimate

45

employment expectations, the issue is not the employee's past performance but 'whether the employee was performing well at the time of her termination.'") (internal citations omitted).

In asserting that Tatum was not performing according to its legitimate expectations, Aurora points to Tatum's 2008 performance issues, Foster's April 2009, evaluation of Tatum as less than competent, and subsequent meetings between Lowery, Tatum and Foster. True, the seeds of inadequate performance were present as shown by the long-standing "tension" that existed between Tatum's performance and Foster's and McCabe's view of it going back to her first annual evaluation in 2008 which was favorable and for which Tatum received a merit increase. However, there is no evidence that those concerns would have formed the basis for Tatum's discharge.

Foster, who hired Tatum, was very solicitous over, and accommodating to Tatum in his efforts to help and support her. Despite Aurora's efforts, the undisputed facts show a steady increase in performance issues raised by multiple people. In August 2009, these performance problems reached the tipping point with the conduct identified in Tatum's termination memo — the hole-punch incident with McCabe and the program incident with Foster. As a consequence, during September 2009, Lowery conducted intensive investigation of those events.

In evaluating Tatum's conduct, Aurora's October 2, 2009, termination memo found that Tatum's behavior towards McCabe, her superior, and Foster, her supervisor, was not consistent with the Aurora Service Standards and Values and that Tatum failed to take

46

initiative to support her coworkers and did not follow reasonable instructions. This misconduct caused Aurora to terminate Tatum's employment. Because "this Court does not . . . sit as 'super-personnel' to question the wisdom or business judgment of employers, this inquiry ends here," with the EEOC's inability to sustain its burden. *Gates*, 513 F.3d at 689. Despite construing the evidence in the light most favorable to the EEOC, based on Tatum's conduct on August 26, and August 27, 2009, a reasonable jury could not conclude that Tatum was performing her job according to Aurora's reasonable expectations.

*More Favorable Treatment of Other Employees*

Even if the EEOC had established that Tatum was meeting Aurora's legitimate job expectations, it has not met its burden of establishing that a similarly situated employee was treated differently. "The similarly situated inquiry is 'a flexible one that considers "all relevant factors, the number of which depends on the context of the case.'" *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 551 (7th Cir. 2011) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). It asks "essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (quoting *Humphries*, 474 F.3d at 405). There must be "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other *prima facie* evidence, would allow a jury to reach an inference of discrimination." *Id.*

> Whether a comparator is similarly situated is "usually a question
> for the fact-finder," and summary judgment is appropriate only

47

when "no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009). There must be "enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007). The "number [of relevant factors] depends on the context of the case." *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). In the usual case a plaintiff must at least show that the comparators (1) "dealt with the same supervisor," (2) "were subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690 (7th Cir. 2008), quoting *Snipes v. Illinois Dep't of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002). This is not a "magic formula," however, and the similarly-situated inquiry should not devolve into a mechanical, "one-to-one mapping between employees." *Humphries*, 474 F.3d at 405.

*Id.* at 846-47.

The EEOC has identified two Caucasian employees, Becker, a chaplain, and Beversdorf, a resident chaplain, who were treated differently than Tatum. Despite the subsequent institutional "shift in focus," the comparators were subject to the same code of conduct as Tatum. *See id.* Foster was the direct supervisor of Becker and, although he delegated the direct supervision of Beversdorf to Tallevast, Foster was involved in the disciplinary process and was a decisionmaker. *See id.* Both Tatum's termination memo and Becker's October 1, 2008, second step warning cited their failure to conform to Aurora' Service Standards and Values. *See id.*

48

To determine "whether two employees have engaged in similar misconduct, the critical question is whether they have engaged in conduct of comparable seriousness." *Id.* at 851, quoting *Peirick v. Ind. Univ.-Purdue Univ. Ind.,* 510 F.3d 681, 689 (7th Cir. 2007). Tatum's termination memo also stated that her employment was terminated for failure to support co-workers and not following instructions. Becker's two verbal warnings were for behaving in a loud and dominant manner to a chaplain resident. His July 9, 2008, performance plan was issued for behavior that included failing to manage his anger appropriately within the department, and an angry confrontation with Foster. Becker's October 1, 2008, second step written warning was for using profane language with a co-worker, repeatedly using the profane word bullshit, hanging up on a co-worker, and calling his supervisor names. Becker's conduct was uncivil and rude.

Unlike Tatum, who believed that she had done nothing wrong, Becker conceded that he had problems. Moreover, Becker's problems with anger and improper communication did not involve refusing to do parts of his job.

Beversdorf, a student training to be chaplain, failed to engage in personal counseling that was part of his acceptance into the chaplain residency program, was tardy to a meeting with a donor and engaged in unbecoming conduct at that meeting, made inappropriate comments to a female cafeteria worker that Foster believed might have been sexual harassment, and engaged inappropriate personal behavior with a female in the cafeteria while Beversdorf was working. Although Beversdorf was considered an employee, unlike

49

Tatum he was a student who was in training to be a chaplain — he was still learning how to act properly in his target profession. Additionally, none of Beversdorf's conduct involved the refusal to do assigned tasks or overt defiance of his superiors.

While *Coleman,* 667 F.3d at 852, warns against "[d]emanding nearly identical comparators [which] can transform this evidentiary 'boost' into an insurmountable hurdle," there is not sufficient evidence that Becker or Beversdorf engaged in "similar conduct" of "comparable seriousness." Despite construing the evidence in the light most favorable to the EEOC, it has not presented evidence upon which a reasonable jury could find that either Becker or Beversdorf were similarly situated to Tatum.

The EEOC has not presented sufficient evidence upon which a reasonable jury could find that it has established a *prima facie* case of discrimination against Tatum under the indirect method of proof. Therefore, the race discrimination claim subject to dismissal upon summary judgment.

### *Retaliation*

Addressing the EEOC's retaliation claim, Aurora maintains that Tatum's participation in mediation is not protected activity, there is no causal connection, and the EEOC has not established pretext. The EEOC states that it proceeds under the direct method of proof for the retaliation claim, the causal connection between Tatum's filing her EEOC charge and using the EEOC mediation process "is shown by the short time span between Tatum using EEOC processes and adverse action taken against [her] — Aurora forbidding

50

[her] from raising complaints against [Foster] and Aurora firing Tatum." (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J., 1.) (ECF No. 26.)

At page six of reply brief, Aurora asserts, without citing any legal authority, that engaging in mediation is not a protected activity. (ECF No. 37.) The EEOC's earlier response brief is premised on the understanding that Aurora does not contest the fact that Tatum engaged in protected activity and that she experienced an adverse employment action. (*Id*. at 9). Additionally, the EEOC relies on both Tatum's filing of the EEOC complaint and the mediation as protected activity. Given the EEOC's stance, the Court need not resolve whether engaging in mediation is protected activity.[28]

Title VII prohibits retaliating against an employee "because [she] has opposed any practice made an unlawful employment practice by [this subchapter,] or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [this subchapter.]" *Brown v. Advocate S. Suburban Hosp.*, 700 F. 3d 1101, 1106 (7th Cir. 2012) (citing 42 U.S.C. § 2000e-3(a)). "The antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of

---

[28]Nonetheless, the Court has conducted some research on the issue. *Erbe v. Potter*, No. 08-CV-0813, 2010 WL 1052947, at *4 (M.D. Pa. Mar. 22, 2010), a non-precedential district court decision, held that a plaintiff who participated informally in pre-complaint counseling and mediation, and filed discrimination complaints, had engaged in protected activity. In *Coleman*, 667 F.3d at 859, the Court of Appeals for the Seventh Circuit noted that the plaintiff's EEOC charges were the most obvious form of protected activity. However, the plaintiff's complaints of race and sex discrimination to her supervisors and request for pre-complaint counseling before filing charges also qualified as protected activity. *Id*. at 859-60.

51

discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006).

Under the direct approach, a plaintiff must present direct or circumstantial evidence of the following: "(1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between the two." *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). Evidence of retaliation is considered to be "direct" when, "if believed, it would prove the fact in question without reliance on inference or presumption." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005). "Because direct evidence 'essentially requires an admission by the employer,' such evidence 'is rare.'" *Argyropoulos,* 539 F.3d at 733 (quoting *Benders v. Bellows & Bellows*, 515 F.3d 757, 764 (7th Cir. 2008)). When such an admission is not present, "[a] plaintiff can prevail under the direct method . . . by 'constructing a convincing mosaic of circumstantial evidence that allows a jury to infer that intentional discrimination by the decisionmaker.'" *See Daugherty v. Wabash Ctr., Inc.,* 577 F.3d 747, 751 (7th Cir. 2009) (quoting *Ridings v. Riverside Med. Ctr.,* 537 F.3d 755, 771 (7th Cir. 2008)).

Even such circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *See Rhodes v. Ill. DOT*, 359 F.3d 498, 504 (7th Cir.2004) (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)); see also *Hanners v. Trent*, 674 F.3d 683, 692 (7th Cir. 2012) (quoting *Davis v. Con-Way Transp. Cent. Express, Inc.,* 368 F.3d 776, 783 (7th Cir. 2004)). Circumstantial evidence that is commonly considered

in evaluating whether the requisite convincing mosaic exists includes "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994); *see also Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009).

"[F]or a plaintiff proceeding under the direct method to defeat summary judgment using circumstantial evidence, all that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had taken an adverse employment action against the plaintiff" in retaliation for the plaintiff's protected activity. *Hanners*, 674 F.3d at 692 (internal quotation marks and brackets omitted). "A causal link between the protected expression and an adverse employment action may be established by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005). "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." *Id.*

Tatum filed the relevant EEOC complaint on June 30, 2009, and participated in mediation on September 22, 2009. The EEOC points to the following as part of its mosaic of circumstantial evidence establishing causation: temporal proximity between the mediation and the firing; Aurora's "falsification" of its internal records of the investigation; Lowery's changing and conflicting explanations of the reasons for terminating Tatum's employment;

53

Aurora's failure to use its own disciplinary notice form for the termination; statements made by Lowery and Foster; Aurora's failure to identify the decisionmakers; and Aurora's "false assertion" that Foster had no knowledge of Tatum's internal race complaints or EEOC charge.

The EEOC relies on the short time interval between the September 22, 2009, mediation and termination of Tatum's employment on October 2, 2009. The timing argument also references the addition of a term to Tatum's revised Job Standards.

The EEOC states that on July 22, 2009, nine days after Aurora learned of Tatum's EEOC charges, Lowery who knew of the EEOC charges, approved the addition to Tatum's Job Standards of a requirement that "forbade Tatum from bringing complaints except through Foster." (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J., 10.) The EEOC's argument is inconsistent with the undisputed facts which establish that as of June 2009, Lowery asked that Foster revise Tatum's Job Standards because of differing views of Foster and Tatum on her job performance. Foster forwarded the revised Job Standards to Lowery on July 13, 2009, which included the provision that "[p]ersonal disagreements or conflicts are handled privately and discreetly." Not only were the revisions in the works prior to July 22, 2009, Foster revised the Standards. There is no evidence that he or Lowery knew of Tatum's EEOC's charges as of July 13, 2009. The revised job standard provision does not support the causal connection element.

There was a ten-day interval between the September 22, 2009, mediation and the termination of Tatum's employment. This time period might be short enough to support

54

an inference of causation. *See Coleman,* 667 F.3d at 861. However, as of September 8, 2009, when Lowery returned from vacation, she began investigating Foster's report about Tatum's late August conduct and the Barr incident. Lowery's investigation continued through September 30, 2009. Thus, the significance of the relatively short time period is diminished by consideration of Lowery's previously commenced and ongoing investigation of the August incidents with McCabe and Foster which provided the basis for Tatum's discharge. *See Ridings v. Riverside Med. Ctr.,* 537 F.3d 755, 774 (7th Cir. 2008) (disciplinary process already was in progress at the time attorney sent demand letter); *Caskey v. Colgate-Palmolive Co.,* 535 F.3d 585, 594 (7th Cir. 2008) (affirming summary judgment where employee was unable to establish causal connection due to intervening event of unexcused absences).

The EEOC also relies upon Aurora's supposed falsification of its internal record of Lowery's investigation. The EEOC asserts that Lowery completed her investigation as of September 11, 2009, and was of the view that Tatum should receive first-step discipline and a formal EAP referral. While Lowery's position as to recommended discipline as of September 11, 2009, is correct, Lowery's investigation of Tatum's conduct was not complete until the end of September. The EEOC's claim that Aurora falsified its internal record is unsupported.

The date for the EEOC mediation of Tatum's charge was finalized on September 16, 2009. On September 16, 2009, Buenger emailed Foster stating that "[they] need[ed] to help Tatum find her next opportunity." Foster indicates that he shared "this" with Lowery.

55

Both Foster and Lowery were decisionmakers with respect to the termination of Tatum's employment.

There is conflicting evidence regarding whether Buenger participated in the decision to terminate Tatum's employment. However, the EEOC need not need to prove that Buenger or another decisionmaker actually knew of the mediation date; a reasonable inference is enough, and an adverse employment action "on the heels of the protected activity" is circumstantial evidence of a decisionmaker's knowledge and retaliation. *See Ridings., * 537 F.3d at 774 (citing *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 941 (7th Cir.1999)). Construed in the light most favorable to the EEOC, the timing and wording of the email provide some support of a causal connection.

According to the EEOC, that communication was followed by Lowery's addition of her "false" description of her interview of Ngugi to the timeline of Tatum's employment. Ngugi was the sole witness to the August 27, 2009, incident between Foster and Tatum whose version of the events supported Tatum. Aurora has not provided any explanation for the significant difference between Lowery's interview notes and the timeline entry. The timeline, used at the mediation and serving in part as the basis for the termination of Tatum's employment, did not include evidence favoring Tatum. Construed in the light most favorable to the EEOC, the inaccuracy regarding Ngugi's interview supports a causal connection.

The EEOC also relies upon the changing and shifting explanations for Tatum's termination as showing causation. Two August 2009 incidents were cited in Tatum's

56

termination memo. The termination was coded as being for misconduct. Lowery was present at the termination meeting, and agrees that the termination memo was accurate. The EEOC relies upon comments allegedly made by Lowery to the unemployment benefits investigator. Although Aurora disputes that Lowery made those statements, viewed in the light most favorable to the EEOC, the changing explanations support a causal relationship.

Aurora's failure to use its own disciplinary notice form for the termination does not contribute to the EEOC's claim of a causal connection. The EEOC has not established that the Aurora decisionmakers were required to use the form. Additionally, the performance memo issued to Becker on July 9, 2009, was in the form of a memorandum — the disciplinary form was not used.

The EEOC also relies on statements made by Lowery and Foster which connect Tatum's complaints to performance issues. That process began in April 2009, before Tatum filed anything with the EEOC. Furthermore, while Lowery only became aware of Tatum's performance issues in 2009, the seeds of the performance issues were present and identified by Foster and McCabe during 2008. They do not support the claimed causal connection.

The EEOC also relies on Aurora's alleged failure to identify the decisionmakers. However, the record is clear that Foster and Lowery made the decision to terminate Tatum's employment. The extent to which Ekstrand and Buenger participated in the process is not entirely clear. The latter question slightly favors the possible causal connection.

57

The EEOC also relies on Aurora's allegedly "false assertion" that Foster had no knowledge of Tatum's internal race complaints or EEOC charge. Viewed in the light most favorable to the EEOC, the evidence before the Court can reasonably be construed as suggesting that Foster was aware of the internal race discrimination complaints based on Lowery's conversation with him shortly after April 22, 2009. However, that fact does not assist the EEOC's causation claim, given the passage of over five months between the knowledge of those complaints and the intervening situations in late August 2009. The EEOC's claim that Foster knew about the EEOC charges lacks sufficient factual support.

The EEOC's contention that Aurora has not been honest about Tatum's disciplinary history is based upon the statement in Tatum's termination memo that she had been coached repeatedly, even though Tatum had not received any written disciplinary notice of a verbal warning. However, it is undisputed that Foster had talked to Tatum on a number of occasions, and Foster considers coaching to include verbal warnings. There is no evidence that Foster or any other Aurora witness believed a verbal warning had to be documented in order for it to be considered in discharging an employee. Therefore, this contention does not support causation.

The majority of the EEOC's claimed evidence of causation is unsupported or not probative of causation. Even when the following evidence and reasonable inferences from it are viewed in the light most favorable to the EEOC, the timing of the mediation; the timing and the wording of Buenger's email; the discrepancy between Ngugi's statements as recorded

58

in Lowery's notes and as summarized on the timeline that played a role in terminating Tatum's employment; and the disputed evidence regarding Aurora's changing explanations, and whether Buenger and/or Ekstrand participated in the decision to terminate Tatum's employment, that evidence does not "point directly to a discriminatory reason for the employer's action." *See Rhodes*, 359 F.3d at 504.

While the reasons for the termination are the August incidents, which occurred after Tatum filed the EEOC complaint, and the termination occurred after the mediation, there is not sufficient evidence to show that the protected events were a motivating factor for Aurora's decision to fire Tatum. The Court so concludes even considering the differing and undisclosed or incomplete record before the EEOC mediation surrounding the facts concerning one of the violations and pre-mediation statement that "new opportunity had to be found." Thus, construed in the light most favorable to the EEOC, there is not sufficient evidence upon which a reasonable jury could find that Tatum's participation in protected activity was the cause of the termination of her employment. Therefore, the EEOC has not presented sufficient evidence to establish a retaliation claim and Aurora is entitled to summary judgment dismissing the EEOC's retaliation claim.

*Pretext*

Even if the EEOC had presented sufficient evidence under the direct method of proof to establish the elements of a retaliation claim, Aurora contends that the EEOC would

59

be required to establish that Aurora's reasons for discharging Tatum were pretextual. Aurora relies on *Argyropoulos,* 539 F.3d at 736 n.6, which states:

> [a]lthough we often discuss the employer's proffer of a nonretaliatory explanation and the corresponding pretext inquiry in terms of the *McDonnell Douglas* burden-shifting framework embodied by the indirect method, e.g., *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004), an employee's failure to cast doubt on an employer's nonretaliatory explanation will also doom a retaliation claim under the direct method.

(citing *Culver*, 416 F.3d at 547 (finding that the plaintiff established *prima facie case* of retaliation under the direct method and proceeding to analyze whether, in light of the employer's proffered non-retaliatory explanation, the plaintiff had created triable issue of pretext)). The court of appeals held that "'if a reasonable fact finder would be compelled to believe the [defendant's] explanation,' *id.*, [the plaintiff's] claim would necessarily fail under either the direct or indirect method." *Id.* (citing *Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 643 (7th Cir. 2002).

Aurora maintains that Tatum was discharged for misconduct caused by her repeated poor job performance. The EEOC counters that Aurora has not been honest about Tatum's disciplinary history.

Having considered the undisputed and disputed facts surrounding the retaliation claim in the light most favorable to the non-movant, this Court concludes that Aurora has articulated legitimate non-discriminatory reason for terminating Tatum's employment. The concerns over Tatum's work performance were present even at the first evaluation in 2008.

60

Foster's statement that "Tatum's performance was good as she began and deteriorated significantly over time," aptly summarizes the situation. Unfortunately for Tatum, her August 2009, behavior and her failure to acknowledge her performance problems were the proverbial "the last straw that broke the camel's back." A reasonable fact-finder would be compelled to find that Aurora would have fired Tatum even if she had not engaged in protected activity. Therefore, summary judgment must be granted as to the retaliation claim. *See Culver*, 416 F.3d at 547-51.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

Aurora's motion for summary judgment (ECF No. 17) is **GRANTED** as to the race discrimination and the retaliation claims, and this action is dismissed with prejudice;

Pursuant to Fed. R. Civ. P. 54(d), Aurora is **AWARDED** costs; and

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 20th day of March, 2013.

BY THE COURT

Hon. Rudolph T. Randa
U.S. District Judge

61